IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**QWEST CORPORATION**, a
**Colorado corporation,**

      Petitioner,

vs.                                            No.    **MC 05-005 MCA**

**ZIANET, INC., a New Mexico**
**corporation,**

      Respondent.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Qwest Corporation's *Petition for the Appointment of an Arbitrator* [Doc. 1], filed January 7, 2005, ZiaNet, Inc.'s *Answer to Petition and Counterclaim for Declaratory Relief and Injunctive Relief* [Doc. 3], filed January 31, 2005, *Qwest's Motion to Strike Counterclaim or, in the Alternative, Treat Counterclaim as Response to Qwest's Petition for the Appointment of an Arbitrator* [Doc. 14], filed March 1, 2005, and Qwest's *Motion for Expedited Relief from Stay* [Doc. 23], filed June 1, 2005. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court hereby lifts the temporary stay entered March 3, 2005, grants Qwest's petition to appoint an arbitrator, grants Qwest's motion to strike, and denies as moot Qwest's motion for expedited relief from the stay.

**I. BACKGROUND**

      This case arises as a result of complex and unresolved billing disputes existing

between Qwest Corp. and ZiaNet, Inc.  Pursuant to a number of written agreements, Qwest provides ZiaNet with a variety of telecommunications services.  All the agreements apparently include dispute resolution clauses.  [Doc. 1].  Some provide as follows: "Any claim, controversy or dispute between the Parties shall be settled by arbitration in accordance with the applicable rules of the American Arbitration Association . . . ."  [Id., Exh. B at 3].  These documents are referred to in the pleadings as the AAA agreements or contracts and are more specific than what are referred to in the pleadings as the remaining agreements.[1]  The remaining agreements state only that "[a]ny claim, controversy or dispute between the parties shall be resolved by binding arbitration in accordance with the Federal Arbitration Act, 9 U.S.C. 1-16, not state law."  [Id., Exh. A].  Whereas the AAA agreements provide for arbitration under the auspices of the AAA, the FAA agreements do not specify a method for naming or appointing an arbitrator.  Despite the parties' efforts to resolve the billing issues, disputes in excess of $1 million remain.  [Doc. 1 at 2].

      Accordingly, in November 2004, Qwest filed a demand for arbitration with the AAA with respect to those contracts providing for AAA arbitration. That proceeding was docketed as AAA Case No. 76 181 Y 00278 04 BEAH ("the BEAH proceeding").  [Doc. 1, Exh. B at 1].  Qwest then requested that ZiaNet agree to arbitrate the FAA contracts as part of the AAA proceeding.  ZiaNet refused and instead filed a complaint before the New Mexico Public Regulation Commission ("PRC").  [Doc. 1 at 2].  ZiaNet asked Qwest to refrain from

---

[1] For purposes of simplicity and clarity, the remaining agreements are referred to in this memorandum as the FAA agreements.

pursuing AAA arbitration until judicial resolution of such threshold arbitrability issues as the validity, enforceability, existence, and scope of what ZiaNet repeatedly refers to as "the alleged agreements to arbitrate." [Doc. 5 at 2]. Qwest refused that request. [See Doc. 3 at 23]. ZiaNet sent the AAA a letter objecting to AAA jurisdiction and to the arbitrability of the claims at issue. [Doc. 5, Exh. A]. The AAA advised ZiaNet that it intended to move ahead with arbitration unless instructed otherwise by court order.

On January 7, 2005, Qwest initiated proceedings in this Court by filing a *Petition for the Appointment of an Arbitrator*, in which it asked the Court to issue an order that the disputes relating to the FAA agreements be arbitrated before the same AAA arbitrator already appointed to handle the BEAH proceeding. [Doc. 1]. In its *Answer to Petition and Counterclaim for Declaratory and Injunctive Relief*, ZiaNet acknowledged that the FAA agreements contain "what purport to be" arbitration or dispute resolution clauses but denied the clauses' binding or enforceable nature. [Doc. 3 at 2]. ZiaNet maintained that (1) arbitration is barred by the New Mexico and federal "filed rate" doctrines, as well as the New Mexico and federal primary jurisdiction doctrines; (2) the arbitration agreements are contrary to public policy and are procedurally and substantively unconscionable; and (3) in the event arbitration is ordered, the Court should, prior to the appointment of an arbitrator, solicit input from the parties as to such arbitrator's necessary qualifications. [Doc. 3 at 7-11]. Pursuant to 28 U.S.C. § 2201, ZiaNet also sought a declaration that none of the arbitration clauses included in the AAA agreements are binding or enforceable. [Id. at 22].

On February 17, 2005, ZiaNet filed its *Motion to Stay Arbitration*. [Doc. 5]. In its

motion, ZiaNet asked the Court to stay arbitration pending determination by the Court of such threshold arbitrability questions as the validity, enforceability, existence, and scope of the AAA agreements.  [Id. at 1].  ZiaNet raised the same defenses in its motion that it raised in its answer/counterclaim and also suggested that the Court defer ruling on the threshold substantive arbitrability issues pending jurisdictional and factual determinations by the PRC and the FCC. [Id. at 2-4].  In response, Qwest submitted that (1) the parties have agreed, in express and unambiguous terms, to proceed to arbitration under the auspices of the AAA, (2) it would be an abuse of discretion to enjoin the arbitration proceedings, and (3) the defenses raised by ZiaNet are all issues for the arbitrator to consider.  [See generally  Doc. 10].  Qwest also moved to strike ZiaNet's counterclaim or, in the alternative, treat the counterclaim as a response to Qwest's *Petition for the Appointment of an Arbitrator* on grounds that (1) the Federal Arbitration Act (FAA) mandates that matters such as this be resolved through motions and (2) there is no pending lawsuit; therefore, there can be no counterclaim.  [See generally Doc. 14].

On March 3, 2005, the Court ordered arbitration stayed for a period of 21 days.  [Doc. 16].  On March 18, 2005, the Court held a hearing on ZiaNet's *Motion to Stay Arbitration*. At the hearing, the Court first made clear that

> [t]here was a motion filed here by Qwest that the Court appoint an arbitrator, *not compel arbitration*, but appoint an arbitrator for some agreements that reportedly bind the parties which contain an arbitration clause, but which do not otherwise identify the proposed arbitrator in this case.
>
> *And the relief sought initially was that the Court appoint* the

>American Arbitration Association, the same arbitrator that would be handling the arbitration for those agreements which had specified them in other contracts.

["Transcript of Proceedings," March 18, 2005, at 3; 4-15 (emphasis added)]. Neither side disputed the Court's characterization of the manner by which Qwest had initiated this action. Indeed, when questioned by the Court as to her understanding of the parties' dispute, counsel for Qwest stated that the issue for determination was how Qwest was to have an arbitrator appointed when there was no method specified by the parties and the parties were unable to agree as to the appointment. [Id. at 6; 12-21; see also id. at 40; 9-10 (counsel for Qwest informing the Court that a motion to compel arbitration is not presently before it)]. Counsel also stated Qwest's position that there is no counterclaim presently pending before the Court, since matters arising under the FAA are to proceed by motion. [Id. at 7; 1-2; see also id. at 48; 13-19].

Counsel for ZiaNet then addressed the Court and stated that Qwest is asking the Court to order ZiaNet to arbitrate billing disputes relating to service contracts executed by the parties. [Transc. at 8; 6-12]. Counsel then explained that, while ZiaNet does not dispute the service contracts, ZiaNet disputes the arbitration agreements included in those service contracts, specifically, that ZiaNet "ever agreed to those arbitrations." [Id. at 9; 10-12]. On questioning by the Court, counsel did not argue that the arbitration agreements were inserted into the service contracts without ZiaNet's knowledge, that ZiaNet agreed to arbitration under duress, that ZiaNet's representative was not competent to execute the agreements, or that ZiaNet did not understand the arbitration agreements. [Id. at 9; 13-22].

5

Instead, counsel put forth what he referred to as "three substantive arbitrability claims that go to the making of the agreement, which we understand is what the Court's first task is before a party is required to go to arbitration." [Transc. at 10; 1-4]. Those three claims are that (1) the filed rate doctrine bars Qwest from including any term—including an agreement to arbitrate—in its service contracts where that term deviates from Qwest's filed rate [id at 10, 14-23]; (2) Qwest has failed to satisfy its burden of demonstrating offer, acceptance, consideration, and mutual understanding of the meaning of the arbitration agreements, which is a prerequisite to a finding that those agreements are valid and enforceable [id. at 18-19; 23-5]; and (3) the primary jurisdiction doctrine mandates that the New Mexico PRC hear and decide the issue, since the PRC is the regulatory agency with exclusive jurisdiction over, and expertise in, matters such as those giving rise to the instant dispute. [Id. at 22; 2-10]. ZiaNet requested time to submit a motion for summary judgment on the issue of the filed rate doctrine and expressed its intention to seek a trial on the issue of its substantive arbitrability defenses. [See id. at 64; 10-17; see also id. at 66; 8-16].

ZiaNet's argument thus did not appear to be that the arbitration agreements do not physically exist or that the service contracts in which they are included suffer from any legal defect. Rather, counsel for ZiaNet framed the issue as being one centering on the validity of the arbitration agreements. [See Transc. at 16; 6-9 ("The problem with [Qwest's] argument is it presumes the valid existence of an agreement to arbitrate. They have not established that. Our defenses challenge that, that they don't even have a valid agreement . . . ."); id. at 21, 9-12 (characterizing ZiaNet's defense as "whether or not these are valid

6

agreements"); id. at 68 18-20 (describing initial threshold issue as "whether there [is] a valid agreement to arbitrate.")]. ZiaNet's position at the March 18 hearing was consistent with what ZiaNet stated it had represented to the PRC in its ongoing proceedings before that agency. [See id. at 24; 18-19 (describing ZiaNet's position in pleadings filed with PRC as one challenging validity of arbitration agreements).]. At the conclusion of the hearing, the Court informed the parties that the stay entered March 3 would be continued and the matter taken under advisement for a short period of time. [Id. at 75; 4-13].

## II. ANALYSIS

### A. Qwest's *Petition for the Appointment of an Arbitrator*

#### 1. Petition for the Appointment of an Arbitrator v. Motion to Compel Arbitration

Section 5 of the FAA provides, in pertinent part, that

> [i]f in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators . . . .

9 U.S.C. § 5. While § 5 provides the framework for the appointment of an arbitrator, § 4 addresses the steps to be taken to compel arbitration when one party resists. Under § 4, if one party moves to compel arbitration and the other party "fail[s], neglect[s], or refus[es]" to arbitrate, "[t]he court shall hear the parties, and upon being satisfied that the making of

the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.  However, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." Id.  The plain language makes clear that when one party moves to compel arbitration under § 4 of the FAA and the other party challenges the making of an agreement to arbitrate, the Court must decide as a threshold matter the existence of the alleged arbitration agreement.  See id.  However, the Court has been unable to locate—and the parties have not cited to—any Tenth Circuit authority describing the role of the Court when one party seeks not to compel arbitration but to have an arbitrator appointed pursuant to 9 U.S.C. § 5.  The Court has found one Second Circuit case detailing the function of the Court in this situation.

In ACEquip Ltd. v. American Eng'g Corp., the Second Circuit was required to determine whether American Engineering Corporation (AEC), a subcontractor on an Air Force building construction project, was "entitled to a hearing to test whether it had a valid arbitration agreement with ACEquip before an appointment [was] made." ACEquip Ltd. v. American Eng'g Corp., 315 F.3d 151, 152 (2nd Cir. 2003).  In 1999, Transact, International was awarded an Air Force contract for the construction of an air cargo handling system at the Kadena Air Base in Okinawa, Japan.  Transact then executed a subcontract, which included an arbitration clause, with AEC and, in 2000, assigned its rights under that subcontract to ACEquip.  Id. at 152-153.  A contract dispute arose after the assignment and

8

ACEquip moved for the appointment of an arbitrator. AEC resisted the appointment, arguing, among other things, that it was entitled to a hearing on the validity of the assignment. The district court appointed an arbitrator and determined that the issue of the assignment's validity was for the arbitrator. Id. at 153-154.

After consideration of "the differences between a motion to appoint an arbitrator and a motion to compel arbitration," the Second Circuit affirmed the appointment of the arbitrator. ACEquip Ltd., 315 F.3d at 155. Concluding that "a somewhat less stringent standard governs the [district] court's decision to appoint an arbitrator as opposed to its decision to compel arbitration[,]" the Court commented that

> AEC argue[d] much of its brief as if the district court had compelled arbitration rather than appointed an arbitrator. AEC argue[d] that where the parties dispute the existence of an agreement to arbitrate, the court must hold a hearing to resolve that dispute before an arbitrator is appointed. *This might present a strong argument if the issue before us involved an order to compel arbitration under 9 U.S.C. § 4*. However, at issue is the appointment of an arbitrator, and we find nothing in the FAA or [applicable state] law to support AEC's argument that it [was] entitled to a hearing on the existence of an agreement to arbitrate before an arbitrator [was] appointed upon the motion of Transact and ACEquip.

Id. at 156 (emphasis added). Rejecting AEC's argument that the district court was required to determine the validity of the arbitration agreement before appointing an arbitrator, the Second Circuit explained that "[t]his argument fails because both 9 U.S.C. § 5 and [applicable state law] require only that there be an agreement . . . to arbitrate. Contrast that simple requirement with 9 U.S.C. § 4, which specifically provides that the court must be

9

'satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue' before issuing an order to compel." Id. at 156-157.

In differentiating an order appointing an arbitrator from one compelling arbitration, the Second Circuit also noted that a party resisting arbitration need not participate in arbitration after the appointment. A resisting party's options include challenging the arbitration agreement after arbitration is complete and/or moving for a declaratory judgment so as to challenge the arbitration agreement after the appointment of an arbitrator but before arbitration begins. ACEquip Ltd., 315 F.3d at 157. The Court went on to distinguish the situation in Abram Landau Real Estate v. Benova,[2] where one party challenged the conclusion that it had ever entered into an arbitration agreement at all, but the arbitration agreement was part of a larger collective bargaining agreement that might or might not have expired when the potentially arbitrable dispute occurred. Id. (*citing* Abram Landau Real Estate v. Benova, 123 F.3d 69 (2nd Cir.1997)).

---

[2] In Abram Landau, the collective bargaining agreement (CBA) that contained the questioned arbitration clause specifically provided in an "evergreen clause" that, upon expiration of the CBA, its terms would continue "in full force and effect for an extended period until a successor agreement shall have been executed." Abram Landau, 123 F.3d at 71. After expiration of the CBA but before execution of a successor agreement, a dispute arose. The parties disagreed as to whether the dispute was arbitrable and the issue before the district court was whether the issue of the validity of the evergreen clause was one for the court or the arbitrator to decide. Id. at 71-72; see also Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775 (10th Cir. 1998) (questioning effect of Settlement Agreement's merger clause on arbitration agreement included in parties' earlier Manufacturing Agreement). The issue now before this Court arises in a context different from that in either Abram Landau or Riley inasmuch as ZiaNet does not challenge the arbitration agreements on the ground of the nonexistence of the service contracts in which they are contained. To the contrary, ZiaNet has specifically stated to the Court that it does not dispute the overall service contracts. [Transc. at 9; 4-6].

This Court is persuaded by the reasoning in ACEquip Ltd.. As did ACEquip, Qwest moved *not* to compel arbitration pursuant to 9 U.S.C. § 4 but, rather, for the appointment of an arbitrator under 9 U.S.C. § 5 because the FAA agreements do specify the method by which an arbitrator may be named. [See Doc. 1 at 2-4]. Again, ZiaNet does not dispute that arbitration agreements physically exist in unchallenged service contracts. Instead, ZiaNet argues that, for several reasons, those arbitration agreements are not valid as a matter of law and further asks the Court to determine their validity as an initial threshold matter. However, persuasive authority holds that the FAA does not require "that the [C]ourt, before proceeding with the appointment of an arbitrator, satisfy itself that the [arbitration] agreement is valid." ACEquip Ltd., 315 F.3d at 157. Once Qwest demonstrates (1) the existence of an agreement to arbitrate and (2) the lack of a method for appointing an arbitrator, Qwest has satisfied the requirements of 9 U.S.C. § 5. See id.; see also 9 U.S.C. § 5. Without passing on the validity of the agreements to arbitrate that are challenged by ZiaNet, this Court concludes that Qwest has met its burden for the appointment of an arbitrator under 9 U.S.C. § 5.

### 2. Appointment of an Arbitrator

As previously explained, this case was initiated on Qwest's petition to have appointed for the arbitration of disputes arising under the FAA agreements the same arbitrator currently handling the arbitration in the BEAH proceeding. [See Doc. 1]. Unlike the AAA agreements, which specify for arbitration under the auspices of the AAA, the FAA agreements do not specify a method for naming or appointing an arbitrator. Under 9 U.S.C. § 5, in cases where there is no method for naming or appointing an arbitrator, "then upon the

11

application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require." 9 U.S.C. § 5; see also Schulze and Burch Biscuit Co. v. Tree Top, Inc., 831 F.2d 709, 716 (7th Cir. 1987) ("The Federal Arbitration Act expressly requires the court, at the behest of either party, to name an arbitrator when the parties' agreement has not named one."). "Where the parties' agreement does not address the appointment of an arbitrator or refers to arbitration rules that do not provide an appointment mechanism, the parties must resort to the statutes authorizing the courts to appoint an arbitrator." 21 Williston on Contracts § 57:68 (4th ed.). Courts have appointed arbitrators pursuant to the authority of 9 U.S.C. § 5 where, for example, one member of a three-person arbitration panel resigned due to illness before any award was rendered, the remaining two arbitrators could not agree on a replacement, and the arbitration clause had not anticipated such a development, Nat'l Am. Ins. Co. v. Transamerica Occidental Life Ins. Co., 328 F.3d 462 (8th Cir. 2003), and where one arbitration panel member died after a partial final award was rendered and the arbitration clause was silent as to the effect of such a death, Trade & Transport, Inc. v. Natural Petroleum Charterers Inc., 931 F.2d 191, 195-196 (2nd Cir. 1991).

      In a case whose facts track fairly closely those presented here, the Ninth Circuit upheld the district court's appointment of an umpire to arbitrate disputes arising under 12 reinsurance agreements, 5 of which contained no contractual procedure for the selection of a neutral umpire, the other 7 of which did. Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp., 814 F.2d 1324 (9th Cir. 1987). As to the five agreements that lacked a

specific arbitrator-selection provision, the Court held that "it is indisputable that the district judge had the power to appoint an umpire." Id. at 1328.  With respect to the remaining seven agreements, the district judge's decision to "step[] in and name[] the umpire . . . was entirely within the powers granted to him by [9 U.S.C. § 5]," id., since the two arbitrators named in those agreements' selection provisions deadlocked on the naming of a third.

This Court is persuaded by the above authorities.  Accordingly, the Court will appoint the same arbitrator currently assigned to the BEAH proceeding to handle any arbitration of the FAA agreements.

### B. Qwest's Motion to Strike ZiaNet's Counterclaim

After Qwest filed its *Petition for the Appointment of an Arbitrator*, ZiaNet filed a pleading styled *Answer to Petition and Counterclaim for Declaratory Relief and Injunctive Relief*. [See Docs. 1, 3].  Qwest moves to strike ZiaNet's counterclaim or, in the alternative, treat the counterclaim as a response to the petition to appoint an arbitrator, since the FAA dictates that matters regarding arbitration be brought and treated as motions. [See generally Doc. 14; see also 9 U.S.C. § 6 ("Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided.").  ZiaNet contends, among other things, that Qwest presents no authority for the proposition that the FAA prevents ZiaNet from asserting a counterclaim. [See Doc. 19 at 1, 3-5, 7].

Qwest, however, has directed the Court to World Brilliance Corp. v. Bethlehem Steel Co., wherein the Second Circuit, held that, while a district court may, in its discretion, order

13

a trial-like hearing on an issue that would typically be heard and decided by the court, "under the [FAA] it is not an abuse of discretion for a district court, as here, to decline to do so." World Brilliance Corp. v. Bethlehem Steel Co., 342 F.2d 362, 366 (2nd Cir. 1965). The Circuit was swayed by the policy underlying 9 U.S.C. § 6, "which is to expedite judicial treatment of matters pertaining to arbitration." Id. at 365-366. In light of that policy, the appellate court concluded that the district court was within its discretion when it decided the issue before it on the motions pleadings rather than in a trial-like setting. Id.

This Court is persuaded by Qwest's position and adopts and incorporates the arguments made in Qwest's motion to strike. Accordingly, the Court will grant Qwest's motion to strike ZiaNet's counterclaim but will allow ZiaNet to refile the pertinent allegations in a motion for declaratory relief pursuant to 28 U.S.C. § 2201(a). Should ZiaNet so move, because an arbitrator will then have been appointed with respect to both the FAA Agreements and the AAA Agreements, the Court will then be able to hear ZiaNet's challenges to the arbitration clauses included in the FAA Agreements and AAA Agreements in one proceeding rather than in a piecemeal fashion. See Martinez v. IRS, 744 F.2d 71, 73 (10th Cir. 1984) (in context of awarding sanctions, discussing importance of courts' need to regulate their docket and promote judicial efficiency).

## III. CONCLUSION

For the foregoing reasons, the temporary stay entered March 3, 2005 is hereby lifted. In light of that ruling, Qwest's *Motion for Expedited Relief from Stay* is denied as moot. Additionally, Qwest's *Petition for the Appointment of an Arbitrator* is granted. Finally,

*Qwest's Motion to Strike Counterclaim or, in the Alternative, Treat Counterclaim as Response to Qwest's Petition for the Appointment of an Arbitrator* is also granted.

**IT IS, THEREFORE, ORDERED** that the temporary stay entered in this matter on March 3, 2005 [See Doc. 16] is LIFTED;

**IT IS FURTHER ORDERED** that Qwest's *Petition for the Appointment of an Arbitrator* [Doc. 1] is GRANTED;

**IT IS FURTHER ORDERED** that the AAA arbitrator appointed to arbitrate the current pending AAA dispute between the parties is APPOINTED with respect to the FAA dispute currently pending between the parties;

**IT IS FURTHER ORDERED** that *Qwest's Motion to Strike Counterclaim or, in the Alternative, Treat Counterclaim as Response to Qwest's Petition for the Appointment of an Arbitrator* [Doc. 14] is GRANTED;

**IT IS FURTHER ORDERED** that Qwest's *Motion for Expedited Relief from Stay* [Doc. 23] is DENIED as moot;

**IT IS FURTHER ORDERED** that ZiaNet is granted leave to file a motion for declaratory judgment, 28 U.S.C. § 2201(a), challenging the arbitration clauses included in the FAA Agreements and the AAA agreements.

**SO ORDERED** this 2nd day of June, 2005, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**