**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**QWEST CORPORATION**, **a
Colorado corporation,**

      Petitioner,

vs.                                        No.    **MC 05-005 MCA**

**ZIANET, INC., a New Mexico
corporation,**

      Respondent.

**MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** comes before the Court on *ZiaNet's Motion and Supporting Brief for Declaratory Judgment Based on Preemption, Filed Rate Doctrine, Public Policy and Primary Jurisdiction Doctrine* [Doc. 26], filed June 14, 2005. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court denies ZiaNet's *Motion*.

**I. BACKGROUND**

      This case arises as a result of complex and unresolved billing disputes existing between Qwest Corporation. and ZiaNet, Inc. This case also has already been the subject of numerous *Motions*, *Responses*, *Replies*, and *Orders* since Qwest first filed its *Petition for the Appointment of an Arbitrator* on January 7, 2005. [See Doc. 1]. Accordingly, the relevant facts regarding the instant *Motion* are set forth herein but are not repeated in their

entirety.[1]

For purposes of ZiaNet's current *Motion* it should be noted that ZiaNet is an Internet Service Provider (ISP) that purchases needed services from Qwest. ZiaNet maintains that it must purchase services from Qwest because no alternative supplier exists. [Doc. 26 at 9]. The documents pursuant to which Qwest provides services ("the overall contractual agreements") state, in pertinent part, that "[a]ny claim, controversy, or dispute between the Parties shall be settled by arbitration . . . ." [Doc. 26, Exh. 8].[2] It is these arbitration clauses that give rise to the dispute between the parties. The thrust of ZiaNet's argument is that the arbitration clauses deviate from the terms of the tariffs that authorize and set forth all applicable rates, terms, and conditions of service. Therefore, the arbitration clauses are unenforceable as violative of the *filed rate doctrine*, which provides "that a carrier's duly filed tariffs set forth and 'exclusively control' all rights and obligations between a carrier and its customers with respect to all charges, terms and conditions, including all 'non-price features' of the services described therein . . . ." [Id. at 10].

Qwest responds that the *filed rate doctrine* does not bar arbitration here. While acknowledging that the tariffs do not include arbitration clauses, Qwest submits that the tariffs nevertheless authorize them by expressly requiring "that a party seeking special

---

[1] For a fuller recitation of the facts of this case, see the Court's first *Memorandum Opinion and Order* [Doc. 24], filed June 2, 2005.

[2] Not all the arbitration clauses contain identical language. [Compare Doc. 26, Exh. 8 at 1-30 and Exh. 8 at 33, 36, 38, 40, 42, 43, 45, 47, 49. However, all the clauses provide for disputes between the parties to be settled through arbitration.

pricing enter into a written agreement containing terms and conditions that are 'consistent with the tariff.'" [Doc. 30 at 3-4]. Qwest asserts that ZiaNet has not demonstrated that the overall contractual agreements and their terms directly conflict with—rather than fail precisely to mirror—the tariffs. [See id. at 4]. The test for whether the arbitration clauses are valid, opines Qwest, is not whether they are explicitly included in the tariffs but whether they (1) constitute an unlawful preference, or (2) directly conflict with the tariffs. Qwest maintains that the arbitration clauses do neither. [Id.].

ZiaNet replies that the *filed rate doctrine* "prohibits a carrier and its customers from deviating *in any way, without exception*, from the terms, conditions and practices specified in the carrier's applicable filed tariffs." [Doc. 37 at 4 (emphasis in original)]. ZiaNet thus contends that Qwest's argument that the arbitration clauses are valid because they are not inconsistent with the tariffs must fail.

## II. ANALYSIS

### A. Arbitration

Section 2 of Title 9 of the United States Code provides that

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. When parties agree to arbitrate a dispute, they trade courtroom procedures and

opportunities for review for the simplicity, informality, and expedition of arbitration. U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 829 (10th Cir. 2005). Indeed, a primary purpose of an arbitration agreement is to avoid the expense and delay of court proceedings. Id. Thus, when a contract contains an arbitration clause, there is a presumption in favor of arbitrability. Local 5-857 Paper, Allied-Industrial, Chemical and Energy Workers Intern. Union v. Conoco, Inc., 320 F.3d 1123, 1126 (10th Cir. 2003).

This case, however, has not been simple or expeditious. In an ironic twist, this case, which began with a petition by Qwest for the appointment of an arbitrator, is now in its eighth month of pretrial sparring because the parties disagree as to the validity and enforceability of the arbitration clauses. Where the parties dispute whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away and it becomes the initial task of the Court to decide as a threshold issue whether such an arbitration agreement exists. See Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998). As previously explained, ZiaNet challenges the validity of the arbitration clauses on the ground that they are barred by the *filed rate doctrine*.

### 1. The Filed Rate Doctrine

The *filed rate doctrine* forbids a regulated entity from charging for its services rates other than those properly filed with the appropriate federal regulatory authority. Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577 (1981). The doctrine was recently described as "a railroad-era contrivance, meant to curb monopolistic railroad companies like that

4

portrayed in Frank Norris's THE OCTOPUS."[3]  Verizon Delaware, Inc. v. Covad Communications Co., 377 F.3d 1081, 1088 (9th Cir. 2004).  Nevertheless, the doctrine has survived into the current Internet age, having passed from transportation law to communications law through the tariff-filing requirement in the Federal Communications Act of 1934 (FCA).  Id.  In the context of telecommunications, "the filed rate doctrine dictates that the rates a carrier charges its customers, once filed with and approved by the FCC, become 'the law' and exclusively govern the rights and liabilities of the carrier to the customer[.]"  Hill v. BellSouth Telecommunications, Inc., 364 F.3d 1308, 1315 (11th Cir. 2004).

Two basic principles underlie the *filed rate doctrine*.  First, the doctrine intends to prevent carriers from engaging in price discrimination as between ratepayers ("the nondiscrimination strand").  The doctrine also seeks to preserve the exclusive role of federal agencies in approving rates for telecommunications services that are "reasonable" by keeping courts out of the rate-making process ("the nonjusticiability strand").  Marcus v. AT&T Corp., 138 F.3d 46, 58 (2nd Cir. 1998).  In American Tel. and Tel. Co. v. Central Office Telephone, Inc., the Supreme Court expanded the doctrine's reach beyond discounted rates to include "non-price features" that amount to discriminatory privileges.  After all, reasoned

---

[3] THE OCTOPUS was published in 1901 and tells the story of an actual clash in 1880 between farmers in California's San Joaquin Valley and the Southern Pacific Railroad.  It was intended as one-third of Norris's never-completed "Epic of the Wheat" trilogy dealing with the production, distribution, and consumption of American wheat.  See http://franknorrisonline.com; see also http://www.amazon.com.

the Court, "[r]ates . . . do not exist in isolation [but] have meaning only when one knows the services to which they are attached." American Tel. and Tel. Co. v. Central Office Telephone, Inc., 524 U.S. 214, 223-224 (1998).

The discriminatory privilege at issue in Central Office Telephone was a promise by AT&T in its capacity as provider of long-distance communications services to provide one of its switchless resellers with faster provisioning of services and allocated billing. Explaining that the FCA makes it unlawful to extend to any person any privileges or facilities in communication, or employ or enforce any classifications, regulations, or practices affecting charges except those set forth in the tariff, the Court concluded that "[f]aster, guaranteed provisioning of orders for the same rate is certainly a privilege within the meaning of . . . the filed rate doctrine" and that the promised billing allocation was "in flat contradiction of the tariff[,]" which provided that AT&T would not allocate usage or charges. Central Office Telephone, 524 U.S. at 223-225. The Court emphasized that "'[t]he rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.'" Id. at 227 (*quoting* Keogh v. Chicago & Northwestern R. Co., 260 U.S. 156, 163 (1922).

Although Central Office Telephone involved provisioning and billing, the Court made clear that "discriminatory 'privileges' come in many guises[,]" such as a railroad's promise to ship a carload of race horses by a particularly fast train, Chicago & Alton R. Co. v. Kirby, 225 U.S. 155 (1912), or a carrier's agreement to provide a shipper with a number of railroad cars on a specified day, Davis v. Cornwell, 264 U.S. 560 (1924). Central Office Telephone, 524 U.S. at 224. The services in Kirby were deemed an undue advantage inasmuch as they

6

were not provided for in the applicable tariff; therefore, Nathaniel Kirby received a benefit not available to others in the same situation. Kirby, 225 U.S. at 166. The services at issue in Davis similarly were deemed a special advantage to the particular shipper and illegal as not included in the tariff. Davis, 264 U.S. at 562.

Not every dispute between carrier and customer, however, is barred by the *filed rate doctrine*. Rather, "[i]n addition to barring suits challenging filed rates and suits seeking to enforce rates that differ from the filed rates, the filed-rate doctrine also bars suits challenging services, billing or other practices *when such challenges, if successful, would have the effect of changing the filed tariff.*'" Multi Solutions Intern., Inc. v. Southwestern Bell Telephone Co., 265 F.Supp.2d 1216, 1221 (D.Kan. 2003) (emphasis added) (*quoting* Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1170 (9th Cir.2002). The *filed rate doctrine* has been held not to apply where a party seeks to enforce a tariff. See, e.g., Lipton v. MCI Worldcom, Inc., 135 F.Supp.2d 182, 187-188 (D.D.C. 2001). The *filed rate doctrine* also has been held not to apply where the plaintiffs' claims (1) did not challenge a filed rate as being unreasonable, (2) did not seek services or privileges in addition to those set forth in an applicable tariff, and (3) were not premised upon the denial of services or privileges guaranteed by an applicable tariff. Paladin Associates, Inc. v. Montana Power Co., 97 F.Supp.2d 1013, 1026 (D. Mont. 2000) (antitrust action).

To the extent that Qwest and ZiaNet are embroiled in billing disputes and Qwest seeks to recover monies owed under the terms of the tariff, Qwest is seeking to enforce the terms

of the tariff.[4]  A finding that the arbitration clauses at issue are valid and enforceable would not have the effect of changing the filed tariff, since the tariff does not address the precise issue here: the appropriate forum for resolving billing disputes arising under the terms of the tariff.  ZiaNet argues to the contrary when it asserts that the tariffs address "certain procedures which Qwest and its customers were required to follow to resolve billing disputes . . . ."  [Doc. 26 at 17].  But the tariff section to which ZiaNet cites in support, § 2.3.2.L.2, does not specify a forum for resolving billing disputes that remain if the procedures set forth in that section of the tariff fail.  [Id., Exh. 10].

Nor would application of the *filed rate doctrine* promote either the nondiscrimination or the nonjusticiability strand. On this point, Hill v. BellSouth Telecommunications, Inc. is instructive.  In Hill, plaintiff/customer Priscilla Hill brought six state-law claims against defendant/telecommunications services provider BellSouth in connection with BellSouth's alleged practice of misleading customers as to the amount of the federal universal service charge it was entitled to collect from them.  Hill v. BellSouth Telecommunications, Inc., 364 F.3d 1308, 1311 (11th Cir. 2004).  Following removal, four claims were dismissed as barred by the *filed rate doctrine*.  The district court, however, concluded that Hill's claims for

---

[4] Parallel proceedings currently are ongoing before the New Mexico Public Regulation Commission (PRC).  On page 35 of its *Order on Jurisdiction, Further Order Regarding Arbitration, and Order on Motion for Oral Argument* issued July 12, 2005 in Case No. 04-00465-UT ("*Order on Jurisdiction")*, the PRC stated that "it clearly appears that only the billing aspects of Zia's complaint, not the alleged discriminatory practices aspects, are sought to be arbitrated."  Further, the PRC has referred to these billing disputes as "the heart of the Complaint."

violations of the Georgia Unfair Trade Practices Act (GUTPA) and fraud and negligent misrepresentation did not give rise to federal-question jurisdiction and remanded them to their state court of origin. Id. at 1312-13.  Re-raising on appeal an argument that the district court did not consider, BellSouth submitted that both the GUTPA and the fraud and negligent misrepresentation claims "create[d] substantial questions of federal law" because they each implicated the *filed rate doctrine*.  Id. at 1314-15.  The Eleventh Circuit agreed with BellSouth and reversed and remanded with instructions to the district court to dismiss these remaining claims as barred under the *filed rate doctrine*.  Id. at 1317.  The Court determined that a difficult question was presented by claims, such as those put forth by Hill, that did not on their face attempt to challenge the filed rate.  However, an examination of the *filed rate doctrine*, persuasive authority[5], and the principles of nondiscrimination and nonjusticiability convinced the Court that Hill's claims, which challenged BellSouth's representations to its customers of the universal service charge, did indeed implicate the *filed rate doctrine* because she was seeking purely monetary damages as relief.  Specifically, Hill was attempting to recover BellSouth's undisclosed charges in excess of its contributions to the universal service charge.  Id. at 1315-17. The Court reasoned that the nondiscrimination strand was implicated by Hill's claims because an award of damages to Hill would effectively change the rate she paid to one below the filed rate paid by other customers. Id. at 1316. The nonjusticiability strand was similarly implicated because "an award of damages

---

[5] The Eleventh Circuit considered Evanns v. AT&T Corp., 229 F.3d 837 (9th Cir. 2000) and Marcus v. AT&T Corp., 138 F.3d 46 (2nd Cir. 1998).

9

to [Hill] would, in effect, result in a judicial determination of the reasonableness of [BellSouth's filed] rate." Id. at 1317.

By contrast, ZiaNet has not demonstrated how enforcement of the disputed arbitration clauses would effectively change the applicable filed rate or result in a judicial determination of the reasonableness of that rate.  Again, to the extent that Qwest is seeking to recover monies owed pursuant to the tariff, Qwest is seeking to enforce the terms of the tariff, though in a forum that ZiaNet would prefer to avoid.  A finding by this Court that Qwest is entitled to press its claims in an arbitral rather than a judicial forum does not require the Court to change the filed rate or interfere in any way with the rate-making process.  Accordingly, the Court concludes that the *filed rate doctrine* does not prohibit arbitration of the billing disputes between ZiaNet and Qwest.

## 2. Public Policy and Primary Jurisdiction

ZiaNet next argues that the arbitration clauses are unenforceable because they violate public policy.  According to ZiaNet, the arbitration clauses are based on contracts that deviate from Qwest's filed tariffs and enforcement of the clauses will effectively entrust private arbitrators with matters that should be addressed by those possessing special regulatory agency expertise, such as the PRC.  ZiaNet also contends that awards or settlements resulting from private arbitration could result in customers paying different rates for tariffed services, particularly in light of the fact that review of arbitration awards is left to the courts, not the PRC or the FCC.  [Doc. 26 at 23-27].  Finally, ZiaNet asks the Court to "suspend its resolution of these substantive arbitrability claims pending referral of [any]

factual disputes to the NMPRC or the FCC to the extent they involve matters within their special competence and expertise." [Id. at 27].

To the extent that ZiaNet believes that arbitration will deprive it of protections it would otherwise enjoy if the PRC were to resolve the issues presented, the Court points to the following language in the PRC's July 12, 2005 *Order on Jurisdiction*:

> At this time . . . the Commission has revisited the question of whether its hearing process is an efficient means of resolving the billing disputes at the heart of the Complaint. Based on the parties' early rounds of filings since the case was docketed, as well as the expansion of the issues before the Hearing Examiner resulting from our examination of the jurisdictional issues today . . . it appears that litigation of the Complaint could go on for an extended period, consuming substantial Commission resources; commercial arbitration is likely to produce a swifter result. For this reason, the Commission finds that it should retain jurisdiction over the Complaint, while directing the Hearing Examiner to stay proceedings pending the issuance of one or more arbitral awards adjudicating the parties' financial obligations with respect to each other. At such time, the Commission would then consider the arbitration decisions, as well as other evidence, and make a determination as to whether further action is warranted to protect the pubic interests of competition and fair dealing that were raised by the Complaint. Such actions could include the imposition of fines, other penalties or administrative orders. In the event that the U.S. District Court orders that arbitration not proceed, and as a result arbitration does not proceed, our stay of the Commission's proceedings will be lifted at that point, and the Hearing Examiner will be directed to hear both the billing and the discrimination aspects of the Complaint in accordance with our jurisdictional determinations.
>
> We believe that the billing disputes, in particular, could be handled best and most efficiently by an experienced arbitrator of complex commercial disputes, and that having them handled in this way could avoid a substantial risk of great duplication of

> effort and the expenditure of substantial Commission resources. It also appears likely that resolution of the billing disputes could go a long way toward resolving the allegations of discriminatory practices, given the close relationship between the two types of issues.
>
> We believe that the billing aspect of the present case involves complex commercial matters that can best be handled by an experienced arbitrator of commercial disputes. While we also believe that the present case involves important matters related to the Commission's essential enforcement mission, we find that we can retain ultimate control over the resolution of those issues by retaining jurisdiction and the ability to enter further orders, and/or to require a Commission hearing, after the arbitration proceedings have been completed and we have had the opportunity to consider the results.

*Order on Jurisdiction*, July 12, 2005, Case No. 04-00465-UT at 36-38. In light of the PRC's decision to retain ultimate control over the issues by retaining jurisdiction, this Court concludes that ZiaNet will not be prejudiced by arbitration of the billing disputes. For the same reason, the Court concludes that neither public-policy concerns nor the primary jurisdiction doctrine supports invalidation of the arbitration clauses.

Accordingly, *ZiaNet's Motion and Supporting Brief for Declaratory Judgment Based on Preemption, Filed Rate Doctrine, Public Policy and Primary Jurisdiction Doctrine* must be denied.

## III. CONCLUSION

For the foregoing reasons, the Court denies *ZiaNet's Motion and Supporting Brief for Declaratory Judgment Based on Preemption, Filed Rate Doctrine, Public Policy and Primary Jurisdiction Doctrine* [Doc. 26].

The Court notes the pendency of *ZiaNet's Motion and Supporting Brief for Declaratory Judgment Based on FAA, Unconscionability and Absence of Consideration, Mutual Assent and Execution* [Doc. 27].  A hearing thereon will be scheduled, with notice forthcoming.

**IT IS, THEREFORE, ORDERED** that *ZiaNet's Motion and Supporting Brief for Declaratory Judgment Based on Preemption, Filed Rate Doctrine, Public Policy and Primary Jurisdiction Doctrine* [Doc. 26] is DENIED.

**SO ORDERED** this 31st day of  August, 2005, in Albuquerque, New Mexico.

                                                                                               _____
                                                                                               **M. CHRISTINA ARMIJO**
                                                                                               **UNITED STATES DISTRICT JUDGE**